J-S56034-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS  TO S.M.H.-G., A MINOR  APPEAL OF, J.A.G. | : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | No. 1889 EDA 2019 |

Appeal from the Order Entered May 30, 2019
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
A2018-0015

BEFORE:  PANELLA, P.J., OLSON, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED DECEMBER 19, 2019**

J.A.G. (Father) appeals from the decree granting the petition filed by L.M.R. (Mother) for the involuntary termination of his parental rights to his daughter, S.M.H.-G. (Child), born in May 2012, pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), and (b).  We affirm.

The trial court summarized the background of this appeal as follow:

> 3. Mother and Father were living together [at the home of Mother's father (Maternal Grandfather)] when Child was born, but they ended their relationship in June of 2012.  [Child] has continued to live with Mother since that time.
>
> 4. Between December of 2012 and April of 2014, Mother and Father were involved in custody litigation  . . . .
>
> 5. In a custody order entered by agreement and filed on April 10, 2013 (hereafter, "2013 Custody Order"), Mother was granted sole physical and legal custody of [Child], with Father to 1) exercise therapeutic supervised visits at Catholic Charities; 2) submit to random urine screens once per week for six months, and 3)

provide Mother's counsel with a copy of his 2012 drug and alcohol evaluation performed by Livengrin Counseling.

6. It is undisputed that Father completed the therapeutic supervised visits through Catholic Charities but did not submit to random urine screens as required by the 2013 Custody Order.

\* \* \*

8. The most recent custody Order was entered by agreement and filed on April 29, 2014 (hereafter, "2014 Custody Order"). Pursuant to the 2014 Custody Order, Mother retain[ed] sole custody of [Child]. Father [could] have supervised custody twice per month using the supervision services of Jeffrey Searfoss, Rana Dimmig, or any other supervisor agreed upon by the parties, the cost of which [wa]s to be borne by Father. Father [wa]s also required to submit to random urine screens once per week for six months and to provide Mother's counsel with a copy of his 2012 drug and alcohol evaluation performed by Livengrin Counseling Center.

9. The reasons for the restrictions on Father's visitation with the child were Mother's belief that Father had an established drug and alcohol problem and was living in an extremely unsafe situation; Father admitted that his alcoholism was the reason for the urine screens.

10. Father has neither attempted to modify the 2014 Custody Order to lift the visitation nor filed a contempt petition related to the 2014 Custody Order.

11. [Father] has not submitted any urine screens.

12. [Father] has not attempted to set up supervised visits with [Child]. He testified he must have overlooked the supervision requirement in the 2014 Custody Order and claimed he was unaware of the requirement.

13. [Father's] last visit with his daughter was [in May 2013]—a planned therapeutic supervised visit scheduled through Catholic Charities that took place on [Child's] first birthday.

14. Other than a very brief, chance encounter at an Applebee's Restaurant in May [2018[1]], has not seen or communicated with [Child] since her first birthday.

15. In the past five years, he has not sent [Child] any gifts, letters, or cards.

16. He has not asked for direct or indirect communication with [Child] through Mother, the maternal grandparents, or other family members or friends.

17. He has not asked Mother, Stepfather, maternal grandparents, or other relatives for a report about [Child]'s health, progress, or education or asked them to deliver any cards, letters or gifts to [Child].

18. In over five years, Father has not attended any doctor or dentist visits, taken [Child] to any activities or to school, or attended school functions or parent teacher conferences.

19. Mother has moved several times since Mother and Father split up, but she has kept the same phone number.[fn3]

> [fn3] Father knew Mother's address at the time he left her in 2012 as they had both been living [with Maternal Grandfather]. In 2014 Mother moved to [a different town]. She believes [her 2014 address] was disclosed to Father though court custody papers. In 2016, she moved back in with Maternal Grandfather . . ., bringing [Stepfather] with her. In 2017, Mother and Stepfather moved to [a new town to live with Stepfather's mother,] and they remain in that home with [Child] to date. Mother admits she did not make Father aware of her [2016 return to Maternal Grandfather's home or her move to the home of Stepfather's mother], but [Mother] testified unequivocally that she remembers giving Father the new phone number that she has maintained since 2013. . . . Father admitted he no longer has the last phone number Mother gave him, but accuses her of changing her number and not giving the new one to him[.]

---

[1] Father stated that during the encounter in 2018, he saw Child, said "hi" to Child, and then left the restaurant. N.T., 12/11/18 at 7.

20. Prior to the hearing, Father did not know where Mother and [Child] were living and had not made any attempts to discover their address. He was unaware whether Mother had moved from [Maternal Grandfather's home, which] he shared with [Mother] when [Child] was born.

21. Father has not called or texted Mother regarding [Child] since 2014.

22. Father has not tried to contact Mother by any means since 2016, when he attempted to reach her through a message to her Facebook account, even though he is aware Mother blocked him from Facebook.

23. Father knows where each of the maternal grandparents lives and how to get in contact with them, but he made no effort to do so as a means by which to have contact with [Child].

24. Mother and her family use social media, but Mother was not aware of any attempts by Father to contact Mother or [Child] through her family members' social media.

25. Father sent a Facebook message to maternal grandfather on July 30, 2017, but the message did not request contact with Mother or [Child] or ask how [Child] was. The message states, "Hello . . . you have always told me actions speak louder then word please all i ask is you look at the body of work and i have become ..please."

26. Father's only attempt to contact Stepfather about [Child] occurred via Facebook after Father received notice of the termination hearing.

27. Father explained that he and/or his family members have inconspicuously followed the social media accounts of Mother and her family members over the last several years in order to get pictures and news of [Child].

28. Father admits he was an alcoholic, was using marijuana, and knew that he could not pass the urine screens ordered by the 2014 Custody Order.

29. [Father] was on probation at the time of the hearing. His criminal record includes a [driving under the influence] and guilty pleas to nine counts of theft as well as one count of knowing and intentional possession of a controlled substance in 2018.

30. Father pays child support regularly at this time. He stopped making payments for a period of time in 2018 but was paying every two weeks at the time of the termination hearing.

Trial Ct. Op., 5/30/19, at 2-5 (record citations and some footnotes omitted).

On March 9, 2018, Mother filed a petition for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (b). The trial court held a hearing on December 10 and 11, 2018, at which Mother, Stepfather, and Father testified.[2]

By decree dated and entered on May 30, 2019, the trial court involuntarily terminated Father's parental rights under Section 2511(a)(1), (2) and (b). Father timely filed a notice of appeal.[3]

_____

[2] All parties were represented by counsel. Child, who was then six years old, was represented by legal counsel, Alfred Stirba, IV, Esquire. As such, the trial court complied with 23 Pa.C.S. § 2313(a). *See In re Adoption of L.B.M.*, 161 A.3d 172, 174-75, 180 (Pa. 2017) (plurality) (stating that, pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome); *In re Adoption of K.M.G.*, ___ A.3d ___, 2019 PA Super 281, 2019 WL 4392506 (Sept., 13, 2019) (*en banc*) (holding that (1) "this Court's authority is limited to raising *sua sponte* the issue of whether the orphan's court violated Section 2313(a) by failing to appoint **any** counsel for the Child in a termination hearing," and (2) we may not "review *sua sponte* whether a conflict existed between counsel's representation and the child's stated preference in an involuntary termination of parental rights proceeding" (citations omitted) (emphasis in original).

[3] Father did not file a concise statement of errors complained of on appeal concurrently with his notice of appeal in contravention of Pa.R.A.P. 1925(a)(2)(i) and (b). Because no party claims prejudice, we will not quash or dismiss his appeal. *See In re K.T.E.L.*, 983 A.2d 745 (Pa. Super. 2009); *Cf. J.P. v. S.P.*, 991 A.2d 904, 908 (Pa. Super. 2010) (holding that appellant waived all issues by failing to file a concise statement of errors complained of on appeal when directed by the trial court).

On appeal, Father presents the following issues for our review:

[1]. Whether the [trial court] abused its discretion in terminating the parental rights of [Father] to [Child], a minor?

[2]. Whether the [trial court] erred in finding that [Mother] had met her burden pursuant to 23 Pa.C.S. § 2511(a)(1) and (2) and § 2511(b)?

Father's Brief at 4.

Father argues that the evidence was insufficient to terminate his parental rights. Specifically, Father argues that Mother prevented him from having a relationship with Child. *Id.* at 12. He emphasizes that Mother failed to provide him with her changes of address and telephone number. *Id.* Father further notes that Mother blocked him from her Facebook account. *Id.* Father insists that "[t]hough [he] was prevented from having a physical relationship with [Child] he maintained child support to ensure that [Child's] financial needs were met." *Id.* at 16. Father relies upon ***In re T.L.G.***, 505 A.2d 628 (Pa. Super. 1986), among other cases, to support his claim that the termination of his parental rights was not appropriate under the circumstances. ***See id.*** at 12.

Our standard of review is abuse of discretion, which our Supreme Court has explained as follows.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest

unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (citation omitted).

This Court may affirm the trial court's termination of parental rights if any one subsection of Section 2511(a) and Section 2511(b) has been established. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we initially focus on Section 2511(a)(1), which provides:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

"A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least the six months prior to the filing of the termination petition." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (emphasis in original). Our Supreme Court has held,

> [o]nce the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998) (citation omitted); *accord In re J.T.M.*, 193 A.3d 403, 409 (Pa. Super. 2018).

It is well settled that:

- 8 -

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations and quotation marks omitted).

Instantly, the trial court initially found that

[t]he last time Father ostensibly performed any parental duties . . . was May [of] 2013, during his last visit with [Child] at Catholic Charities. That was nearly five years before Mother filed the termination petition. Since then, other than paying child support for [Child], Father has not performed any parental duties. . . . When Mother was asked, "[W]ithin the past year, has [Father] done anything with regard to parenting of your child, supervising your child, or providing for your child?" Mother answered, "No, nothing at all." Father did not dispute this testimony, although he

offered his own reasons for his non-involvement. Mother clearly and convincingly demonstrated that Father has failed to perform parental duties for his daughter for a period much longer than six months.

Trial Ct. Op., 5/30/19, at 9 (record citations and footnote omitted).

Father does not dispute that aside from paying child support, he has not performed any parental duties since 2013. Instead, Father claims that Mother impeded his ability to maintain contact with Child.

As to Father's explanations for not remaining in contact with Child, the record reveals the following. Regarding Father's failure to exercise supervised custody under the 2014 Custody Order, Father asserted that he was not aware that he could have arranged for supervised custody. N.T., 12/11/18, at 24. Father also maintained that Mother and the court overseeing the custody matter would not have allowed him to see Child. *Id.* at 41. At the same time, Father acknowledged that his continued involvement with drugs and failure to appear for urine screens would have prevented him from exercising custody of Child under the 2014 Custody Order. *Id.* at 42-44.

Regarding Father's claim that Mother blocked him on Facebook, Mother explained that she blocked Father after Father sent her harassing messages that did not relate to Child. N.T., 12/10/19, at 43. Mother further testified that she had Twitter, Instagram, and LinkedIn accounts, but Father did not contact her using those accounts. *Id.* at 25. Additionally, Mother testified that her family was on social media, but Father did not contact them about Child. *Id.* at 24-26, 43-44. Father, in turn, testified that he contacted

- 10 -

Maternal Grandfather through Facebook in July of 2017. N.T., 12/11/18, at 14-16, 21. However, Father did not ask about Child in that message. *Id.* at 16. Rather, Father testified the purpose of his Facebook message was to show the Maternal Grandfather "how far I've come from [when I] liv[ed] with him." *Id.* Moreover, Mother stated that her telephone number has been the same since before the issuance of the 2014 Custody Order, that Father knew the number, but that Father did not call or her text her. N.T., 12/10/18, at 19-20, 45, 52.

Lastly, as to Father's assertion that Mother moved without informing him, Father only recently discovered Mother moved out of Maternal Grandfather's home, where Father and Mother lived when Child was born. N.T., 12/11/18, at 25. There was no evidence that Father attempted to contact Child or send Child any cards or gifts to Maternal Grandfather's home.

Based on the foregoing, we find no merit to Father's claim that the trial court erred in terminating Father's parental rights under Section 2511(a)(1). The trial court properly determined that Father failed to perform his parental duties since 2013. *See id.* at 9. The trial court acknowledged that Mother raised some barriers to Father's ability to maintain contact with Child. *See id.* at 10-14. However, the trial court concluded that that those barriers did not prevent Father from contacting Child, and that Father failed exercise reasonable firmness in overcoming the obstacles. *See id.* at 14. Following our review, we conclude the record supports the trial court's findings, and we

find no abuse or discretion or error of law in the trial court's determinations. *See T.S.M.*, 71 A.3d at 267; *see also J.T.M.*, 193 A.3d at 410.

Moreover, to the extent Father relies on on *T.L.G.*, that case is distinguishable. In *T.L.G.*, the mother did not provide her most recent address or telephone number to the father, who lived in Texas. *T.L.G.*, 505 A.2d at 629-30. Nevertheless, the father in *T.L.G.* attempted to maintain contact with the children by sending gifts and money to the mother's aunt and by inquiring of the aunt about the children's needs. *Id.* Here, by contrast, Father did not use the available resources in Mother's family to maintain contact with Child. Accordingly, Father's claims merit no relief.

As to Section 2511(b), we initially note that Father does not discuss the needs and welfare of Child in the argument section of his brief. While we could find such an issue waived for failure to present an argument or cite legal authority, we will address the issue. *See In re C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*) (addressing the best interests of the child under Section 2511(b) *sua sponte*). *But see M.Z.T.M.W.*, 163 A.3d 462, 466 & n.3 (Pa. Super. 2017).

Section 2511(b) states:

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

This Court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but the focus of Section 2511(b) is on the child. *See C.L.G.*, 956 A.2d at 1008. In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (some citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted). Further, "in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citation omitted).

Instantly, the trial court found as follows:

> [A]ny parental role Father played was limited to the first year of [Child's] life. Since then, he has had no contact with her. Stepfather has taken on a parental role and is the only father figure [Child] knows. . . .

> Mother and Stepfather are [Child's] primary parental relationships. They provide her with love, comfort, security, and stability. They have met all of her daily physical and emotional needs. Testimony adduced at the hearing established that she enjoys an affectionate relationship with Stepfather and that he already acts in the role of father to [Child]. He has been a stable paternal presence in her life since 2012. Continuity of that relationship and permanence in a stable, loving home will best serve [Child's] developmental, physical and emotional needs and welfare. Considering her tender years and the fact that any contact with Father was limited to the first year of her life, the [c]ourt does not believe that permanently severing the bond will have any negative effect on [Child], and, in fact, the bond with Stepfather is a bond that should be preserved. Accordingly, we find the termination of Father's parental rights is in [Child's] best interest so that the [c]ourt can give legal effect to the relationship that already exists in fact between [Child] and Stepfather.

Trial Ct. Op., 5/30/19, at 15-16 (citations omitted).

Our review reveals that Mother's and Stepfather's testimony supports the court's findings. Mother testified that Child has never had a relationship with Father, and that she knows Stepfather as her father. N.T., 12/10/18, at 22-23. Stepfather described his relationship with Child having "no difference as far as whether or not I'm the biological father. . . . [Child]'s really just everything to me. [I have b]een there since she was four months old. And I think I fell in love with her before I did her mom. . . . I love her to death." *Id.* at 57. Mother testified that it is in Child's best interest to terminate Father's parental rights "because [Child] knows my husband as her father[,] and he has provided for every single need that she [has] ever had since she was less than one year[] old. And we have established a family together; and she is happy, safe, and well-cared for in that family." *Id.* at 23.

Based on the foregoing, we discern no abuse of discretion by the trial court in concluding that terminating Father's parental rights serves the developmental, physical, and emotional needs and welfare of Child pursuant to Section 2511(b). *See T.S.M.*, 71 A.3d at 267. Accordingly, we affirm the decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/19/19